REDACTED

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | CASE NO. 12-MD-02311 HON. MARIANNE O. BATTANI |
| In Re: INSTRUMENT PANEL CLUSTERS CASES | |
| THIS RELATES TO:  DIRECT PURCHASER ACTIONS | P:12-cv-00201-MOB-MKM |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiff ACAP, L.L.C., f/k/a Aguirre, Collins & Aikman Plastics, LLC, individually and on behalf of a proposed class of direct purchasers of Instrument Panel Clusters (as defined below), brings this class action against Defendants under the federal antitrust laws for treble damages and alleges as follows.

### NATURE OF THE CASE

1.      Beginning at least as early as January 2001, the Defendants - United States and global manufacturers and suppliers of Instrument Panel Clusters - operated a price fixing cartel by entering into a continuing conspiracy to rig bids and fix, raise, maintain, or stabilize prices at supra-competitive levels for Instrument Panel Clusters sold in the United States.  As a result of Defendants' unlawful conduct, Plaintiff and the Class members paid artificially inflated prices for Instrument Panel Clusters and as a result have suffered antitrust injury to their business or property in violation of the federal antitrust laws.

2.      In the related U.S. Department of Justice Antitrust Division criminal investigation of price fixing in the motor vehicle parts industry, Defendants Nippon Seiki Co. Ltd. and Yazaki

1

REDACTED

Corporation have been criminally charged and pleaded guilty to antitrust violations with respect

to Instrument Panel Clusters. Defendant Denso Corporation, one of the world's largest suppliers

of Instrument Panel Clusters, and its subsidiaries have been the subject of raids by antitrust

authorities in the United States and Japan, and Denso Corporation has been criminally charged

and pleaded guilty to antitrust violations relating to other automotive parts, including electronic

control units ("ECUs") and heater control panels ("HCPs").

        3.      Plaintiff brings this action under Section 1 of the Sherman Act of 1890, 15 U.S.C.

§ 1 ("Sherman Act") and Section 4 of the Clayton Act of 1914, 15 U.S.C. § 15 ("Clayton Act"),

and asserts the following allegations on information and belief, except as to those paragraphs that

pertain to Plaintiff, which are based upon personal knowledge. Plaintiff's information and belief

are based upon, *inter alia*, the investigation made by its attorneys.

## DEFINITIONS

        4.      "Instrument Panel Clusters" are the mounted array of instruments and gauges

housed in front of the driver of a motor vehicle. They are also known as meters.

        5.      The "Class Period" is from at least as early as January 2001 through and including

the present.

## JURISDICTION AND VENUE

        6.      Plaintiff brings this action to recover damages, including treble damages, and

costs of suit and reasonable attorneys' fees, resulting from Defendants' violations of the Sherman

Act, 15 U.S.C. § 1.

        7.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and

28 U.S.C. §§ 1331, 1332(d) and 1337.

2

101366

**REDACTED**

8.      Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c) and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside in, are licensed to do business in, are doing business in, had agents in, are found in or transact business in this District.

9.      The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States.

10.     This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia,* each Defendant: (a) transacted business throughout the United States, including in this District, (b) manufactured, sold, shipped, and delivered substantial quantities of Instrument Panel Clusters throughout the United States, including in this District, (c) had substantial contacts with the United States, including in this District, and (d) was engaged in an illegal scheme and price fixing conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the United States, including in this District.

## THE PARTIES

11.     Plaintiff ACAP, L.L.C., f/k/a Aguirre, Collins & Aikman Plastics, LLC ("Plaintiff" or "ACAP") is a Michigan limited liability company with its principal place of business in the State of Michigan.  Plaintiff purchased Instrument Panel Clusters directly from one or more of the Defendants during the Class Period.

3

REDACTED

*Yazaki Defendants*

12.     Defendant Yazaki Corporation is a corporation organized and existing under the laws of Japan, with its principal place of business in Tokyo, Japan.

13.     Defendant Yazaki North America Inc. ("Yazaki North America") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Canton Township, Michigan.  It is a subsidiary of, and owned and controlled by, its parent, Yazaki Corporation.

14.     Yazaki Corporation and Yazaki North America are hereinafter jointly referred to as the "Yazaki Defendants."

15.     The Yazaki Defendants manufactured, marketed, and/or sold Instrument Panel Clusters in or into the United States during the Class Period.

*Nippon Seiki Defendants*

16.     Defendant Nippon Seiki Co. Ltd. ("Nippon Seiki") is a corporation organized and existing under the laws of Japan, with its principal place of business in Nagaoka, Japan.

17.     Defendant N.S. International, Ltd. is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Troy, Michigan.  It is a subsidiary of, and owned and controlled by, its parent, Nippon Seiki.

18.     Defendant New Sabina Industries, Inc. is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Sabina, Ohio.  It is a subsidiary of, and owned and controlled by, its parent, Nippon Seiki.

19.     Nippon Seiki, N.S. International, Ltd., and New Sabina Industries, Inc. are hereinafter jointly referred to as the "Nippon Seiki Defendants."

4

**REDACTED**

20.     The Nippon Seiki Defendants manufactured, marketed, and/or sold Instrument Panel Clusters in or into the United States during the Class Period.

*Denso Defendants*

21.     Defendant Denso Corporation is a Japanese corporation with its principal place of business located in Kariya, Japan.

22.     Defendant Denso International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan.  It is a subsidiary of, and owned and controlled by, its parent, Denso Corporation.

23.     Defendants Denso Corporation and Denso International America, Inc. are hereinafter jointly referred to as the "Denso Defendants" or "Denso."

24.     The Denso Defendants manufactured, marketed, and/or sold Instrument Panel Clusters in or into the United States during the Class Period.

25.     The acts alleged in this Complaint to have been done by Defendants Yazaki North America,  N.S. International, Ltd., New Sabina Industries, Inc., and Denso International America, Inc. were authorized, ordered and condoned by their parent companies and the acts alleged to have been done by the Yazaki, Nippon Seiki and Denso Defendants were authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

26.     Each Defendant acted as a principal or an agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

**INTERSTATE TRADE AND COMMERCE**

27.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

5

101366

**REDACTED**

28.     During the Class Period, Defendants manufactured, sold and shipped substantial quantities of Instrument Panel Clusters in a continuous and uninterrupted flow of interstate and foreign commerce.

## THE WORLDWIDE AND U.S. ANTITRUST INVESTIGATIONS INTO PRICE FIXING IN THE MOTOR VEHICLE PARTS INDUSTRY

29.     According to the United States Department of Justice ("DOJ"), the motor vehicle parts investigation, of which Instrument Panel Clusters is a part, is the "largest criminal investigation the [DOJ] has ever pursued," both in terms of scope and potential volume of commerce affected by the alleged illegal conduct. As the DOJ explained, the parts being investigated "are ... essential to the wiring, circuit boards, gauges and fuel tanks of automobiles."

30.     In February 2010 and June 2010, during its ongoing investigation into anticompetitive conduct in the market for motor vehicle parts, the European Commission ("EC") conducted raids at the European offices of several motor vehicle parts suppliers, including Yazaki Corporation.

31.     With respect to the raids, an EC official stated, "[t]he Commission has reason to believe that the companies concerned may have violated European Union antitrust rules that prohibit cartels and restrictive business practices."

32.     Also in February 2010, in conjunction with its investigation into collusion in the market for motor vehicle parts, Japan's Fair Trade Commission ("JFTC") raided the Tokyo offices of motor vehicle parts manufacturers Furukawa Electric Co., Ltd., Sumitomo Electric Industries Ltd., and Yazaki Corporation.

33.     With respect to the United States price fixing investigation, in February 2010, the same month that Japanese and European authorities conducted raids, FBI investigators executed

6

**REDACTED**

warrants and searched the offices of three Japanese motor vehicle part makers in metropolitan Detroit. Yazaki North America and Denso International America, Inc. were among the companies searched.

34.    According to the DOJ, "[t]he antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers" and is coordinating its investigation with European antitrust regulators.

35.    Commenting on her division's investigation, Sharis A. Pozen, Acting Assisting Attorney General in charge of the Department of Justice's Antitrust Division, stated that "[a]s a result of this international price-fixing and bid-ridding conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers." She further stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

36.    "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," said FBI's Special Agent in Charge Andrew G. Arena. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

37.    As part of this investigation, several suppliers of motor vehicle parts and their employees have already agreed to plead guilty to price fixing in violation of Section 1 of the Sherman Act and to pay very substantial criminal fines for their conduct, including a near record fine of $470 million assessed against Yazaki for bid-rigging and price fixing of, *inter alia*, Instrument Panel Clusters.

7

REDACTED

38.     In July 2011, the JFTC raided seven Japanese auto parts makers including Defendant Denso Corporation. The *Japan Times* reported that the JFTC "suspects the parts manufacturers had meetings from 2002 or earlier to set parts prices and decided which companies would win contracts before bidding for orders from automakers."

## INSTRUMENT PANEL CLUSTERS

39.     Instrument Panel Clusters, also known as meters, are the mounted array of instruments and gauges housed in front of the driver in a motor vehicle.

40.     Instrument Panel Clusters manufactured, distributed or sold by Defendants during the Class Period are not functionally distinguishable in any material respect.

41.     Instrument Panel Clusters are installed by motor vehicle original equipment manufacturers ("OEMs") in new motor vehicles as part of the motor vehicle manufacturing process. They are also installed in motor vehicles to replace worn out, defective, or damaged Instrument Panel Clusters.

42.     OEMs include the Big Three in Detroit (General Motors, Ford and Chrysler) and non-domestic companies that also operate manufacturing plants in the U.S. For example, during the Class Period, Nissan manufactured motor vehicles in Mississippi and Tennessee, Toyota in Kentucky, BMW in South Carolina, Honda in Ohio and Alabama, Hyundai and Mercedes-Benz in Alabama and Kia in Georgia. Suppliers, such as Plaintiff, purchased Instrument Panel Clusters directly from certain Defendants, which they then sold to OEMs or other suppliers to OEMs.

43.     When purchasing Instrument Panel Clusters, OEMs issue Requests for Quotation ("RFQs") to motor vehicle parts suppliers. For automotive OEMs, the bidding process begins approximately three years prior to the start of production of a new model platform. In response,

8

**REDACTED**

motor vehicle parts suppliers submit quotations or bids and the OEM usually awards the business to the selected motor vehicle part supplier for the anticipated production cycle of the platform, usually four to six years. Japanese OEMs procure parts for U.S.-manufactured motor vehicles both in Japan and the United States.

44.     During the Class Period, Defendants sold Instrument Panel Clusters directly to OEMs, suppliers to OEMs and other purchasers.

45.     Defendants and their co-conspirators supplied Instrument Panel Clusters to OEMs for installation in motor vehicles manufactured and sold in the United States and elsewhere. The Defendants and their co-conspirators manufactured Instrument Panel Clusters (a) in the United States for installation in motor vehicles manufactured and sold in the United States, (b) in Japan and elsewhere for export to the United States and installation in motor vehicles manufactured and sold in the United States, and (c) in Japan for installation in motor vehicles manufactured in Japan for export to and sale in the United States.

46.     Plaintiff and members of the proposed Class purchased Instrument Panel Clusters directly from the Defendants.

47.     During the Class Period, Defendants, who in a competitive market would be horizontal competitors with other Instrument Panel Cluster manufacturers, engaged in a conspiracy to rig bids for and to raise, fix, maintain, or stabilize prices of Instrument Panel Clusters. As a result of their unlawful conduct, Defendants did not compete but instead enjoyed business insulated from competition.

9

REDACTED

## THE CHARACTERISTICS OF THE MARKET FOR INSTRUMENT PANEL CLUSTERS ARE CONDUCIVE TO COLLUSION

48.     In addition to the Defendants' guilty pleas, several important economic characteristics of the market for Instrument Panel Clusters render it plausible that there was collusion among suppliers.

### *High Barriers to Entry*

49.     A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Therefore, high barriers to entry help facilitate a cartel.

50.     There are high barriers to entry in the market for Instrument Panel Clusters. Entry requires a company to incur significant start-up capital expenditures. A new entrant into the business would have to incur millions of dollars in costs, including capital expenditures on plants and equipment, as well as transportation, electricity, infrastructure for distribution, and labor.

51.     Another factor contributing to barriers to entry is the common use of contracts between suppliers and large volume purchasers of Instrument Panel Clusters. A new entrant would face a significant hurdle to break into the market in the face of existing contracts with incumbent suppliers.

### *Price Inelasticity*

52.     When a seller of goods or services can increase prices without suffering a substantial reduction in sales, pricing is considered inelastic. In order for a cartel to profit from raising prices above competitive levels, pricing must be relatively inelastic. Otherwise, increased prices would result in declining sales, revenues, and profits.

10

101366

**REDACTED**

53.     OEMs must use Instrument Panel Clusters because there are no viable substitute products.  Therefore, pricing for Instrument Panel Clusters is highly inelastic.

*Opportunities for Collusion*

54.     Defendants attended industry events, such as the Detroit Auto Show, fostering opportunities to conspire.  Such industry events have provided myriad opportunities to meet, conspire, and share information.

55.     

56.

## DEFENDANTS' PRICE FIXING CONSPIRACY

57.     During the Class Period, Defendants and their co-conspirators conspired to allocate the supply of Instrument Panel Clusters and raise, fix and maintain prices for Instrument Panel Clusters sold in or into the United States.

58.     Defendants and their co-conspirators engaged in numerous acts of anticompetitive conduct in furtherance of the alleged conspiracy, as described below.

59.     Defendants and their co-conspirators participated in meetings, conversations, and communications in the United States and abroad to discuss bids and price quotations for Instrument Panel Clusters sold in or into the United States.

11

101366

REDACTED

60.    Defendants and their co-conspirators agreed during those meetings, conversations, and communications to allocate the supply of Instrument Panel Clusters sold in or into the United States.

61.    Defendants and their co-conspirators agreed during meetings, conversations, and communications to coordinate price adjustments requested by motor vehicle manufacturers.

62.    Defendants and their co-conspirators submitted bids, price quotations, and price adjustments to motor vehicle manufacturers in the United States in accordance with their conspiratorial agreements.

63.    Defendants and their co-conspirators held meetings and conversations in the United States and elsewhere to monitor and police their bid-rigging, market allocation, and price-fixing conspiracy.

64.    Defendants and their co-conspirators affirmatively undertook measures to conceal their unlawful conduct, including but not limited to, using code names, ████████████ ████████████████████████████████████████████ and meeting at private residences or remote locations.

65.    Defendants accomplished their conspiracy, in part, by rigging bids they made in response to RFQs.

66.    The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (1) the OEM issues the RFQ to multiple parts suppliers, (2) the suppliers submit bids, (3) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing, (4) the suppliers submit revised bids, and (5) the OEM selects the winner.

**REDACTED**

67.    Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

68.    When OEMs purchase Instrument Panel Clusters directly from the supplier to whom it awarded the contract, the OEMs purchase the Instrument Panel Clusters at the winning price.

69.    That winning price is also used when OEM suppliers that were not part of the RFQ process purchase Instrument Panel Clusters directly from the winning Instrument Panel Cluster bidder for incorporation into products manufactured for and sold to OEMs. Those suppliers, who directly purchase Instrument Panel Clusters from the winning bidder, pay the winning bidder at least the winning price.

70.    Defendants' conduct persisted for over ten years (2001-present). Had governmental authorities in the United States and abroad not launched an antitrust investigation into anticompetitive conduct in the market for motor vehicle parts, it is likely that Defendants' conspiracy would have continued undetected.

71.    Defendants manipulated the RFQ process to accomplish their conspiracy.

72.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

73.    Further, Defendants coordinated their Instrument Panel Cluster pricing. Defendants submitted responses to RFQs that incorporated changes to pricing based on the conspiratorial agreements they made with each other. ███████████████████████████████████████████████████████████████████████████████

13

**REDACTED**

████████████████████████████████████████████████████████

██████████████████

74.     During the class period Defendants communicated, held meetings, and reached conspiratorial agreements in the United States and in Japan in furtherance of their price-fixing conspiracy.  Defendants' activities included, but were not limited to, the following:

        a.     Agreeing to unlawfully coordinate pricing for Instrument Panel Clusters and allocate sales of Instrument Panel Clusters. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

        b.     █████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

        c.     ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████

75.     Defendants and their co-conspirators knew and intended that their actions regarding their sales of Instrument Panel Clusters to motor vehicle manufacturers would have a direct impact on prices for Instrument Panel Clusters sold to all direct purchasers of Instrument Panel Clusters throughout the United States.

14

**REDACTED**

76.     Defendants engaged in a single price fixing conspiracy involving Instrument Panel Clusters that impacted not only multiple bids submitted to OEMs but also the prices paid by all other direct purchasers of Instrument Panel Clusters. Defendants' scheme was implemented, succeeded, and affected the prices for all Instrument Panel Clusters.

## UNITED STATES CRIMINAL CHARGES

77.     On January 30, 2012, the DOJ charged Yazaki Corporation with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of" Instrument Panel Clusters, automotive wire harnesses and related products, and fuel senders in violation of the Sherman Act.

78.     According to the criminal information, Yazaki Corporation and its co-conspirators carried out the conspiracies by:

      a.     participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to certain motor vehicle manufacturers in the United States and elsewhere;

      b.     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain motor vehicle manufacturers in the United States and elsewhere;

      c.     agreeing, during those meetings, conversations, and communications, to allocate the supply of Instrument Panel Clusters sold to certain motor vehicle manufacturers in the United States and elsewhere on a model-by-model basis;

15

**REDACTED**

      d.      agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain motor vehicle manufacturers in the United States and elsewhere;

      e.      submitting bids, price quotations, and price adjustments to certain motor vehicle manufacturers in the United States and elsewhere in accordance with the agreements reached;

      f.      selling Instrument Panel Clusters to certain motor vehicle manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

      g.      accepting payment for Instrument Panel Clusters sold to certain motor vehicle manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

      h.      engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

      i.      employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

79.      Also on January 30, 2012, the DOJ announced that Yazaki Corporation had agreed to pay a $470 million criminal fine and plead guilty to a three-count criminal information charging it with, among other things, engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of Instrument Panel Clusters in violation of the Sherman Act. On March 1, 2012, Yazaki Corporation pleaded guilty to this charge. Yazaki's $470 million criminal fine is the second largest federal antitrust fine ever imposed on a single company.

**REDACTED**

80.     On August 16, 2012, Yazaki Corporation's Toshio Sudo agreed to plead guilty,
serve a fourteen month prison sentence, and pay a $20,000 criminal fine for his involvement in a
conspiracy to restrain trade in the market for Instrument Panel Clusters in violation of the
Sherman Act.  Sudo was employed by Yazaki Corporation as a Department Manager with
responsibility for sales of Instrument Panel Clusters to Toyota Motor Corporation from January
2003 until at least February 2009.  On September 26, 2012, Sudo pleaded guilty to this charge
before The Honorable George Steeh of the U.S. District Court for the Eastern District of
Michigan.  As part of his guilty plea, Sudo admitted that during meetings and conversations with
co-conspirators, "agreements were reached to allocate the supply of instrument panel clusters
sold to certain automobile manufacturers on a model-by-model basis, rig bids quoted to certain
automobile manufacturers for instrument panel clusters, and to fix, stabilize, and maintain the
prices, including coordinating price adjustments requested by certain automobile manufacturers"
for Instrument Panel Clusters sold in the United States.

81.     In an August 16, 2012 DOJ press release, Scott D. Hammond, Deputy Assistant
Attorney General of the Antitrust Division's criminal enforcement program, stated, "[f]rom
using code names with one another, to meeting in private or private locations, the conspirators
employed a variety of measures to keep their illegal conduct secret."  "The division and its law
enforcement partners will continue to do everything in our power to detect these cartels and
bring them to justice."

82.     On August 28, 2012, the DOJ charged Defendant Nippon Seiki with participating
in a "combination and conspiracy to suppress and eliminate competition in the automotive parts
industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of" Instrument
Panel Clusters in violation of the Sherman Act.

17

**REDACTED**

83.    According to the criminal information, Nippon Seiki and its co-conspirators :

a.    participated in meetings, conversations, and communications in Japan to discuss the bids and price quotations to be submitted to a motor vehicle manufacturer in the United States and elsewhere;

b.    agreed, during those meetings, conversations, and communications, on bids and price quotations to be submitted to a motor vehicle manufacturer in the United States and elsewhere;

c.    agreed, during those meetings, conversations, and communications, to allocate the supply of Instrument Panel Clusters sold to a motor vehicle manufacturer in the United States and elsewhere on a model-by-model basis;

d.    submitted bids, price quotations, and price adjustments to a motor vehicle manufacturer in the United States and elsewhere in accordance with the agreements reached;

e.    sold Instrument Panel Clusters to a motor vehicle manufacturer in the United States and elsewhere at collusive and noncompetitive prices;

f.    accepted payment for Instrument Panel Clusters sold to a motor vehicle manufacturer in the United States and elsewhere at collusive and noncompetitive prices;

g.    engaged in meetings, conversations, and communications in Japan for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

h.    employed measures to keep their conduct secret, including using code names.

18

REDACTED

84.    Also on August 28, 2012, the DOJ announced that Defendant Nippon Seiki had agreed to pay a $1 million criminal fine and plead guilty to a one-count criminal information charging it with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of Instrument Panel Clusters in violation of the Sherman Act.  On November 8, 2012, Nippon Seiki pleaded guilty to this charge before The Honorable George Steeh of the U.S. District Court for the Eastern District of Michigan.

85.    The DOJ's Deputy Assistant Attorney General of the Antitrust Division's criminal enforcement program, Scott D. Hammond, stated in an August 28, 2012 press release that Defendant Nippon Seiki "conspired to sell instrument control panels at collusive and noncompetitive prices, affecting the prices of many automobiles sold in the United States." "The division will continue to hold companies accountable for these types of anticompetitive practices that harm American consumers."

86.    According to a company statement, Defendant Nippon Seiki ordered management-level executives to take salary cuts in connection with the DOJ criminal charges. Nippon Seiki's President Shoji Nagai and other senior executives received pay cuts of 15-20% for a two-month period.

87.    On January 30, 2012, the DOJ announced that Defendant Denso Corporation agreed to plead guilty to a two-count criminal information and pay a total of $78 million in criminal fines.  Denso Corporation was charged with: (1) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the motor vehicle parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of ECUs sold to a motor vehicle manufacturer in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of §1 of the Sherman Act;

19

REDACTED

and (2) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the motor vehicle parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold to a motor vehicle manufacturer in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the §1 of the Sherman Act. On March 5, 2012, Denso Corporation pleaded guilty to these charges.

88.    On January 31, 2012, Defendant Denso Corporation issued a news release stating that "to emphasize the seriousness of these matters, Denso Corporation's chairman, president and certain board members and executive directors will voluntarily return 30 percent to 10 percent [sic] of their compensation for a three-month period starting in February 2012."

89.    According to Denso's website, it is one of the world's largest Instrument Panel Clusters manufacturers and had a global market share of about 15% as of 2001, just before the start of the alleged conspiracy.

## CLASS ACTION ALLEGATIONS

90.    Plaintiff brings this action on behalf of itself and pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as the representative of a Class defined as follows:

> All direct purchasers of motor vehicle Instrument Panel Clusters in the United States from any of the Defendants (or their controlled subsidiaries, affiliates, or joint-ventures) between at least as early as January 2001 and the present ("the Class").

91.    Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of Class members is unknown to Plaintiff, it is believed to be in the hundreds. The identity of the members of the Class can be readily determined from information and records in the possession of Defendants.

20

101366

**REDACTED**

92.    Plaintiff's claims are typical of the claims of the members of the class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*, they have paid artificially inflated prices for Instrument Panel Clusters as a result of Defendants' anticompetitive and unlawful conduct.

93.    Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

94.    Plaintiff is represented by counsel experienced and competent in the prosecution of antitrust class action litigation.

95.    Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendants' anticompetitive and unlawful conduct.

96.    Questions of law and fact common to the Class include, but are not limited to:

    a.    Whether Defendants contracted, combined, or conspired to fix, raise, maintain, or stabilize prices of, or to rig bids for, Instrument Panel Clusters;

    b.    The existence and duration of the contract, combination, or conspiracy alleged herein;

    c.    Whether the contract, combination, or conspiracy caused Instrument Panel Cluster prices to be higher than they would have been in the absence of Defendants' conduct;

    d.    Whether Defendants' conduct caused injury to the business or property of Plaintiff and members of the Class;

21

REDACTED

    e.    Whether Defendants' conduct violates Section 1 of the Sherman Act;

    f.    Whether Defendants undertook actions to conceal their unlawful conspiracy; and

    g.    The appropriate measure of the amount of damages suffered by the Class.

97.    A class action is superior to the other methods available for the fair and efficient adjudication of this litigation since individual joinder of all Class members is impracticable.  The damages suffered by the individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation.  Thus, absent the availability of class action procedures, it would not be feasible for Class members to redress the wrongs done to them.  Further, individual litigation presents the potential for inconsistent judgments and would greatly magnify the delay and expense to all parties and the court system.  Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision in a single court.

## ANTITRUST INJURY SUFFERED BY PLAINTIFF AND THE CLASS

98.    Defendants' anticompetitive conduct has had the following effects:

    a.    price competition has been restrained, suppressed, or eliminated with respect to Instrument Panel Clusters;

    b.    the prices of Instrument Panel Clusters have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

    c.    purchasers of Instrument Panel Clusters have been deprived of free and open competition in the Instrument Panel Cluster market.

101366

**REDACTED**

99.     As a result of the contract, combination, or conspiracy, Plaintiff and Class members paid anticompetitive and higher prices for Instrument Panel Clusters than they would have in the absence of the conspiracy, and Plaintiff and Class members have sustained injury to their business or property.

<strong>PLAINTIFF'S CLAIMS ARE TIMELY</strong>

100.     Plaintiff incorporates by reference the allegations set forth above and adopts same as though fully set forth herein.

101.     Plaintiff and the members of the Class had no knowledge of the anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until at least February 2010, at the earliest, the date that raids of certain Defendants were conducted. As a result, Plaintiff and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least February 2010, at the earliest.

102.     No information in the public domain was available to Plaintiff and the members of the Class prior to February 2010, when the DOJ executed warrants and searched the offices of three Japanese motor vehicle part makers in metropolitan Detroit. Prior to that time, there was insufficient information to suggest that any one of the Defendants was involved in a conspiracy to price-fix and rig bids for Instrument Panel Clusters. For these reasons, the statute of limitations as to Plaintiff's and the Class's claims did not begin to run until at the earliest February 2010 with respect to the claims that Plaintiff and the members of the Class have alleged in this Complaint.

103.     Further, fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the Class until at least February 2010. Defendants affirmatively

23

**REDACTED**

and wrongfully concealed their anticompetitive conduct from Plaintiff and the Class, from at least as early as January 2001 through at least February 2010. During that time, Plaintiff and the Class did not learn or discover the operative facts giving rise to the instant Complaint.

104.    Before at least February 2010, Plaintiff and members of the Class were unaware of Defendants' unlawful conduct, and did not know before then that that they were paying supra-competitive prices for Instrument Panel Clusters throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiff and the members of the Class that would have suggested to Plaintiff that it was being injured by Defendants' unlawful conduct.

105.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

106.    By its very nature, Defendants' anti-competitive conspiracy was inherently self-concealing. Instrument Panel Clusters are not exempt from antitrust regulation and, thus, Plaintiff and the members of the Class reasonably considered it to be a competitive industry. Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business.

107.    Defendants represented publicly, both to customers and otherwise, that their pricing and bidding activities were unilateral, rather than based on anticompetitive agreements. In making those false representations, Defendants misled Plaintiff and members of the Class as to the true, collusive, and coordinated nature of their bid rigging, customer allocation, and price-fixing activities.

24

**REDACTED**

108.    Defendants' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

109.    In particular, Defendants participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

110.    During these meetings, conversations, and communications, Defendants agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

111.    Defendants likewise agreed to allocate the supply of Instrument Panel Clusters sold to customers in the United States and elsewhere on a model-by-model basis.

112.    Defendants also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

113.    In accordance with the agreements reached by Defendants, they submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

114.    For example, the DOJ charged Defendant Yazaki Corporation with, among other unlawful acts, "employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations." The DOJ also charged Defendant Nippon Seiki with "employing measures to keep [its] conduct secret, including using code names." These corporate Defendants have since pleaded guilty to charges levied against them by the DOJ.

115.    In addition, the DOJ charged Toshio Sudo, an individual corporate officer of Defendant Yazaki Corporation, with using code names and engaging in secret, conspiratorial meetings to hide Defendants' conspiracy with regards to Instrument Panel Clusters from the

25

REDACTED

public and competition authorities. Mr. Sudo has since pleaded guilty to charges levied against

him by the DOJ. Accordingly, a reasonable person under the circumstances would not have been

alerted to investigate the lawfulness of Defendants' Instrument Panel Clusters prices.

116.   ███████████████████████████

███████████████████████████

117.   Plaintiff and the members of the Class could not have discovered the alleged

combination or conspiracy at an earlier date by the exercise of reasonable diligence because of

the deceptive practices and techniques of secrecy employed by the Defendants and their co-

conspirators to avoid detection of, and fraudulently conceal, their conduct.

118.   For these reasons, the statute of limitations applicable to Plaintiff's and the

Class's claims was tolled and did not begin to run until at least February 2010.

## COUNT I: CLAIM FOR VIOLATION OF SHERMAN ACT § 1

119.   Plaintiff incorporates by reference the allegations set forth above and adopts same

as though fully set forth herein.

120.   Defendants entered into and engaged in a contract, combination, or conspiracy in

an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

121.   The acts done by each of the Defendants as part of, and in furtherance of, the

contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents,

employees, or representatives while actively engaged in the management of Defendants' affairs.

122.   Commencing at least as early as January 2001 and continuing until the present,

the exact dates being presently unknown to Plaintiff, Defendants entered into a continuing

agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize,

and control prices for Instrument Panel Clusters, creating anticompetitive effects.

26

REDACTED

123.    Defendants' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Instrument Panel Clusters throughout the United States.

124.    As a result of the contract, combination, or conspiracy alleged herein, the prices charged to Plaintiff and members of the Class for Instrument Panel Clusters were unlawfully raised, fixed, maintained, or stabilized in the United States.

125.    The contract, combination, or conspiracy has had the following effects:

    a.      prices paid by Plaintiff and members of the Class for Instrument Panel Clusters were raised, fixed, maintained, or stabilized at non-competitive levels;

    b.      Plaintiff and members of the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Instrument Panel Clusters; and

    c.      competition in the market for Instrument Panel Clusters has been unlawfully restrained, suppressed, or eliminated.

126.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been damaged and will continue to be damaged by paying supra-competitive prices that they would not have had to pay in the absence of the unlawful conduct of Defendants as alleged herein.

127.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, and respectfully requests the following relief:

101366

REDACTED

  A.  That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

  B.  That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

  C.  That Plaintiff and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

  D.  That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

  E.  That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

  F.  That Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

  G.  That Plaintiff and members of the Class receive such other or further relief as may be just and proper.

101366

REDACTED

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all

issues so triable.

Dated: January 15, 2013

/s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
FINK + ASSOCIATES LAW
100 West Long Lake Road; Ste. 111
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com

Gregory P. Hansel
Randall B. Weill
Jonathan G. Mermin
Michael S. Smith
PRETI, FLAHERTY, BELIVEAU &
PACHIOS LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
jmermin@preti.com
msmith@preti.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

101366

**REDACTED**

Steven A. Kanner
William H. London
Michael E. Moskovitz
Michael L. Silverman
FREED KANNER LONDON &
MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com
msilverman@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF &
WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

*Counsel for Plaintiff ACAP, L.L.C. f/k/a
Aguirre, Collins & Aikman Plastics, LLC
and the Proposed Class*

30

101366

**REDACTED**

| | |
|---|---|
| Joseph M. Fisher (P13542)<br>Karen H. Safran (P51317)<br>CARSON FISCHER, P.L.C.<br>411 Andover Road West – Second Floor<br>Bloomfield Hills, MI 48302-1924<br>Telephone: (248) 644-4840<br>jfisher@carsonfisher.com<br>ksafran@carsonfisher.com<br><br>Robert N. Kaplan<br>KAPLAN FOX & KILSHEIMER LLP<br>850 Third Avenue<br>14th Floor<br>New York, NY 10022<br>(212) 687-1980<br><br>Solomon B. Cera<br>GOLD BENNETT CERA & SIDENER LLP<br>595 Market Street<br>Suite 2300<br>San Francisco, CA 94105-2835<br>(415) 777-2230<br><br>Linda P. Nussbaum<br>GRANT & EISENHOFER P.A.<br>485 Lexington Avenue, 29th Floor<br>New York, NY 10017<br>(646) 722-8500<br><br>Steven D. Irwin<br>David V. Weicht<br>LEECH TISHMAN FUSCALDO<br>& LAMPL, LLC<br>525 William Penn Place, 30th Floor<br>Pittsburgh, PA 15219<br>(412) 261-1600<br><br>Bruce E. Gerstein<br>GARWIN GERSTEIN & FISHER, LLP<br>1501 Broadway, Suite 1416<br>New York, NY 10036<br>(212) 398-0055 | Robert Peurach (P34446)<br>DAKMAK PEURACH, P.C.<br>615 Griswold Street, Suite 600<br>Detroit, MI 48226<br>Telephone: (866) 732-9522<br>rpeurach@gdakmak.com<br><br>Irwin B. Levin<br>COHEN & MALAD, LLP<br>One Indiana Square, Suite 1400<br>Indianapolis, IN 46204<br>(317) 636-6481<br><br>W. Joseph Bruckner<br>LOCKRIDGE GRINDAL<br>   NAUEN P.L.L.P.<br>100 Washington Avenue South<br>Minneapolis, MN 55401<br>(612) 339-6900<br><br>Jeffrey S. Goldenberg<br>GOLDENBERG SCHNEIDER, LPA<br>35 East Seventh Street, Suite 600<br>Cincinnati, OH 45202<br>(513) 345-8291<br><br>Steve Greenfogel<br>LITE DEPALMA GREENBERG, LLC<br>1521 Locust Street<br>Philadelphia, PA 19102<br>(215) 564-5182<br><br>Daniel J. Mogin<br>THE MOGIN LAW FIRM, P.C.<br>707 Broadway, Suite 1000<br>San Diego, CA 92101<br>(619) 687-6611<br><br>R. Alexander Saveri<br>Cadio Zirpoli<br>SAVERI & SAVERI, INC.<br>706 Sansome Street<br>San Francisco, CA 94111<br>(415) 217-6810 |

101366

REDACTED

| | |
|---|---|
| Lee Albert<br>GLANCY BINKOW & GOLDBERG LLP<br>77 Water Street, 7th Floor<br>NYC, NY 10006<br>(646) 722-4180 | Jason J. Thompson<br>SOMMERS SCHWARTZ PC<br>2000 Town Center, Suite 900<br>Southfield, MI 48075<br>(248) 355-0300 |
| Vincent J. Esades<br>HEINS MILLS & OLSON, P.L.C.<br>310 Clifton Avenue<br>Minneapolis, MN 55403<br>(612) 338-4605 | Garret Blanchfield<br>REINHARDT, WENDORF<br>     & BLANCHFIELD<br>E-1250 First National Bank Bldg.<br>332 Minnesota St.<br>St. Paul, MN 55101<br>(651) 287-2100 |
| Lewis Goldfarb<br>MCELROY, DEUTSCH, MULVANEY<br>   & CARPENTER, LLP<br>1300 Mount Kemble Avenue<br>P.O. Box 2075<br>Morristown, NJ  07962-2075<br>(973) 425-8689 | Joseph R. Saveri<br>JOSEPH SAVERI LAW FIRM<br>505 Montgomery Street, Suite 625<br>San Francisco, California  94111<br>(415) 500-6800 |
| Manuel John Dominguez<br>COHEN MILSTEIN SELLERS & TOLL<br>   PLLC<br>3507 Kyoto Gardens Drive<br>Suite 200<br>Palm Beach Gardens, FL 33410<br>(561) 578-6850 | Marvin A. Miller<br>MILLER LAW LLC<br>115 S. LaSalle Street, Suite 2910<br>Chicago, IL 60603<br>(312) 332-3400 |

*Additional Counsel*