**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

IN RE: AUTOMOTIVE PARTS
ANTITRUST LITIGATION                          MASTER FILE NO. 12-md-02311


_____

In Re: Instrument Panel Clusters                HON. MARIANNE O. BATTANI


_____

THIS DOCUMENT RELATES TO:                   2:12-cv-00201

Direct Purchaser Actions

_____/

**OPINION AND ORDER DENYING DEFENDANTS' COLLECTIVE**
**MOTION TO DISMISS ACAP'S CONSOLIDATED**
**AMENDED CLASS ACTION COMPLAINT**

Before the Court is Defendants' Collective Motion to Dismiss Direct Purchaser

Plaintiff's ("DPP") Complaint (Doc. No. 61).  The Court heard oral argument on

November 13, 2013, and at the conclusion of the hearing, took this matter under

advisement.  For the reasons that follow, Defendants' motion is **DENIED.**

**I.  INTRODUCTION**

On February 7, 2012, the United States Judicial Panel on Multidistrict Litigation

("Judicial Panel" or "Panel")  transferred actions sharing "factual questions arising out of

an alleged conspiracy to inflate, fix, raise, maintain, or artificially stabilize prices of

automotive wire harness systems" to the Eastern District of Michigan.  (12-md-02311,

Doc. No. 2).  In its transfer order, the Judicial Panel noted that the majority of cases

were pending in the Eastern District, as was the first filed action, that several defendants were located in this district, and that a related criminal investigation was underway in this district.  (Id.)  The Panel determined that centralizing litigation in this District would eliminate duplicative discovery, prevent inconsistent pretrial rulings and conserve resources.  (Id.)   After complaints were filed alleging conspiracies to fix prices of three additional component parts, the Judicial Panel determined that including all actions in MDL No. 2311 would result in the most efficient handling of the case.  The Judicial Panel noted the existence of similar conspiracies with overlapping defendants arising from the same government investigation as well as an overlap of parties and counsel.  The additional component part cases were transferred to this Court for coordinated pretrial proceedings, and In re: Automotive Wire Harness Systems Antitrust Litigation was renamed "In re: Automotive Parts Antitrust Litigation."  (Doc. No. 117 in 12-2311).  There are now twenty-eight component part cases pending.  (See Doc. No. 665 in 12-2311).

On January 15, 2013, Direct Purchaser Plaintiff filed its Consolidated Amended Class Action Complaint ("CACAC") for the Instrument Panel Clusters.  (Doc. No. 48 in 12-201).  Defendants assert that the Direct Purchaser Plaintiff's Consolidated Amended Class Action Complaint ("CACAC" Doc. No. 48) fails to meet the minimum requirements for pleading an antitrust conspiracy, that Direct Purchaser Plaintiff lacks standing to bring a claim for money damages under the Sherman Act, the statute of limitations bars Sherman Act claims accruing before October 8, 2008, and DPP lacks standing to seek injunctive relief.

2

Because the same arguments were raised and addressed in the Court's prior ruling on a motion to dismiss the wire harness direct purchaser plaintiffs' complaint, the Court relies on the analysis from the opinion to the extent that no distinction between the two cases is needed.

## II.  FACTUAL ALLEGATIONS

Direct Purchaser Plaintiff, ACAP LLC f/k/a Aguirre, Collins & Aikman Plastics LLC ("ACAP" or "DPP") brings this class action against Defendants for damages and injunctive relief under the antitrust laws of the United States arising out of DPP's purchase of Instrument Panel Clusters ("IPCs").  The CACAC includes allegations about the parties, allegations about the product and the nature of the conspiracy, the market conditions, and the guilty pleas entered by Defendants.  The allegations are set forth in greater detail below.

### A.  The Parties

ACAP is a Michigan limited liability company, and "purchased Instrument Panel Clusters directly from one or more of the Defendants during the Class Period."  (Doc. No. 48 at ¶ 11).  Defendants manufactured, marketed, or sold IPCs in the United States and include Yazaki Corporation, Yazaki North America Inc. (collectively "Yazaki"), Nippon Seiki Co. Ltd., N.S. International, Ltd, New Sabina Industries, Inc. (collectively "Nippon Seiki"), Denso Corporation, and Denso International America (collectively "Denso").

### B.  The Product and Nature of the Conspiracy

Instrument Panel Clusters are the mounted array of gauges found on an

automobile's dashboard. According to DPP, the IPCs "are not functionally distinguishable in any material respect." (Doc. No. 48 at ¶ 40).

Original equipment manufacturers ("OEMs") install IPCs in new motor vehicles as part of the manufacturing process. (Doc. No. 48 at ¶ 41). OEMs send out Requests for Quotation ("RFQs") to motor vehicle parts suppliers as part of the purchasing process for IPCs. (Doc. No. 48 at ¶ 43). The bidding process begins three years before production of a new model platform, which is used for four to six years. (Id.) Defendants sold IPCs directly to suppliers and other purchasers in the United States and elsewhere. (Doc. No. 48 at ¶¶ 44-45).

In addition IPCs "are installed in motor vehicles to replace worn out, defective, or damaged IPCs." (Doc. No. 48 at ¶ 41). According to the Consolidated Amended Class Action Complaint, "Suppliers, such as Plaintiff, purchased Instrument Panel Clusters directly from certain Defendants, which they then sold to OEMs or other suppliers to OEMs." (Doc. No. 48 at ¶ 42).

DPP alleges it was injured by a conspiracy among the seven Defendants to fix prices on IPCs. Defendants are alleged to have conspired from January 1, 2001. The conduct supporting the conspiracy follows:

> Defendants and their co-conspirators participated in meetings, conversations, and communications in the United States and abroad to discuss bids and price quotations for Instrument Panel Clusters sold in or into the United States. (Doc. No. 48, at ¶ 59).

> Defendants and their co-conspirators agreed to "coordinate price adjustments" and "submitted bids, price quotations, and price adjustments" as agreed, and monitored and policed their conduct. (Id. at ¶¶ 59-63).

4

> Defendants also kept their conduct concealed by using code
> names and instructing recipients of emails to delete them
> after reading, and meeting at private residences and remote
> locations.  (Id. at ¶ 64).

### C.  Market Conditions and Investigation

DPP alleges that there are significant barriers to entry in the market for IPCs:
significant start-up capital expenditures; the common use of contracts between
suppliers and large volume purchasers (Doc. No. 48 at ¶¶ 49-51); relatively inelastic
pricing, and no viable substitute products.  (Doc. No. 48 at ¶¶ 52-53).  Lastly, DPP
notes that there were opportunities for Defendants to conspire at industry events.  (Id.
at ¶ 54).

ACAP also advances allegations regarding the Department of Justice ("DOJ")
investigations as well as the investigation by the European Commission ("EC") and
Japanese Fair Trade Commission ("JFTC") into antitrust activity.  According to the DOJ,
"the motor vehicle parts investigation. . .is the largest criminal investigation the [DOJ]
has ever pursued, both in terms of scope and potential volume of commerce affected
by the alleged illegal conduct."  (Doc. No. 48 at ¶ 29).  The EC, the JFTC and the DOJ
raided the offices of Yazaki Corporation as part of its investigation into anticompetitive
conduct.  (Id. at ¶¶ 30-33).  In addition, DOJ searched the offices of Yazaki Corporation
and Denso International America, Inc.  (Id. at ¶ 32).

 On March 1, 2012, Yazaki Corporation paid a $470 million fine and pleaded
guilty to engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the
prices of Instrument Panel Clusters in violation of the Sherman Act.  (Doc. No. 48 at ¶

5

79).  On September 26, 2012, its Department Manager, with responsibility for sales of

IPCs to Toyota Motor Corporation, pleaded guilty to conspiring to restrain trade from

January 2003 through at least February 2009.  (Doc. No. 48 at ¶ 80).  Nippon Seiki also

pleaded guilty to conspiring to sell instrument control panels at collusive and

noncompetitive prices.  (Doc. No. 48 at ¶ 85).  Lastly, Denso, which is one of the

world's largest manufacturers of Instrument Panel Clusters, with a global market share

of about 15%, pleaded guilty to price fixing two different automotive component parts.

## III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a

complaint when it fails "to state a claim upon which relief can be granted."  When

reviewing a motion to dismiss, the Court "must construe the complaint in the light most

favorable to the plaintiff, accept all factual allegations as true, and determine whether

the complaint contains enough facts to state a claim to relief that is plausible on its

face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Although the federal

procedural rules do not require that the facts alleged in the complaint be detailed, " 'a

plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more

than labels and conclusions, and a formulaic recitation of a cause of action's elements

will not do.' "  Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

("Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice.").  Under Iqbal, a civil complaint will only survive

a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a

claim for relief that is plausible on its face. . . .  Exactly how implausible is 'implausible'

remains to be seen, as such a malleable standard will have to be worked out in

6

practice."  Courie v. Alcoa Wheel & Forged Prods., 577 F.3d 625, 629-630 (6th Cir.

2009).

## IV.  ANALYSIS

### A.  Plausibility of the CACAC Antitrust Claim

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form

of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1.  In

Twombly, the Supreme Court considered the pleading requirements needed to

withstand a motion to dismiss a Section 1 Sherman Act claim.  It held that a complaint

must contain "enough factual matter (taken as true) to suggest" the existence of an

agreement.  550 U.S. at 556.

> Asking for plausible grounds to infer an agreement does not
> impose a probability requirement at the pleading stage; it
> simply calls for enough facts to raise a reasonable
> expectation that discovery will reveal evidence of illegal
> agreement. And, of course, a well-pleaded complaint may
> proceed even if it strikes a savvy judge that actual proof of
> those facts is improbable, and that a recovery is very remote
> and unlikely.

Id.

The Court begins its analysis here, as it did in the wire harness case, with a

recapitulation of the facts before the Supreme Court in Twombly.  The plaintiffs brought

a consumer antitrust class action against local telephone and telecommunications

carriers alleging the defendants conspired to restrain trade.  According to the plaintiffs,

the defendants engaged in parallel conduct to "inhibit the growth" of companies new to

the market and agreed not to compete with each other.  550 U.S. at 550-551.  The

defendants moved to dismiss the complaint on the ground that it failed to include

7

factual allegations from which an express or tacit agreement could be inferred.  Id. at

552.  The Supreme Court observed that "[a]n antitrust conspiracy plaintiff with evidence

showing nothing beyond parallel conduct is not entitled to a directed verdict. . . [and]

proof of a § 1 conspiracy must include evidence tending to exclude the possibility of

independent action."  Id. at 554 (citation omitted). The Twombly Court added that "at

the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to

rule out the possibility that the defendants were acting independently."  Id. (citing

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)).

Because the Supreme Court dismissed the antitrust claim in Twombly, the

decision does not stand as an example of the type of allegations that would satisfy the

plausibility standard.  Nevertheless, the Supreme Court provided general guidance.  It

indicated that a "heightened fact pleading of specifics" is not needed to state an

antitrust conspiracy claim, 550 U.S. at 570, although parallel behavior is not enough.

Defendants maintain that the ACAC does not satisfy Ashcroft v. Iqbal, 556 U.S.

662 (2009); however, Iqbal did not alter the pleading requirements set forth in Twombly.

Iqbal answered the question of whether Twombly was limited to antitrust claims or

applied universally.  Iqbal, 556 U.S. at 684.  The Supreme Court summarized its

decision in Twombly as follows:

> Our decision in Twombly illustrates the two-pronged
> approach. There, we considered the sufficiency of a
> complaint alleging that incumbent telecommunications
> providers had entered an agreement not to compete and to
> forestall competitive entry, in violation of the Sherman Act,
> 15 U.S.C. § 1. Recognizing that § 1 enjoins only
> anticompetitive conduct 'effected by a contract, combination,
> or conspiracy," Copperweld Corp. v. Independence Tube
> Corp., 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628

8

(1984), the plaintiffs in Twombly flatly pleaded that the defendants 'ha[d] entered into a contract, combination or conspiracy to prevent competitive entry. . .and ha[d] agreed not to compete with one another.' 550 U.S., at 551, 127 S.Ct. 1955 (internal quotation marks omitted). The complaint also alleged that the defendants' 'parallel course of conduct. . .to prevent competition' and inflate prices was indicative of the unlawful agreement alleged.  Ibid. (internal quotation marks omitted).

The Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a 'legal conclusion' and, as such, was not entitled to the assumption of truth.  Id., at 555, 127 S.Ct. 1955. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the 'nub' of the plaintiffs' complaint "the well-pleaded, nonconclusory factual allegation of parallel behavior' to determine whether it gave rise to a 'plausible suggestion of conspiracy.'  Id., at 565-566, 127 S.Ct. 1955. Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior.  Id., at 567, 127 S.Ct. 1955.  Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed.  Id., at 570, 127 S.Ct. 1955.

Iqbal, 556 U.S. at 679-80.

This Court rejected the wire harness defendants' argument that Twombly required dismissal of the wire harness case.  This Court held the case could proceed because the complaint included sufficient allegations to inform the defendants what wrongdoing they were alleged to have committed and enabled the defendants to respond to the allegations.  Further, the Court concluded that after reviewing the allegations together,  the complaint contained plausible grounds to infer an agreement.

9

Plausible grounds were set forth in allegations about the government investigations, which were used to bolster the plausibility of § 1 claims; the guilty pleas by multiple defendants; the structure of the wire harness industry; and the allegations demonstrating Defendants' opportunity to meet and collude.  Based upon the context of this case, the Court's judicial experience, and plain common sense,  the Court finds DPP has advanced a plausible antitrust claim.

Although DPP advances similar allegations here, Defendants argue that distinctions in the allegations advanced in this case warrant dismissal.   At oral argument Defendants highlighted the differences between the IPC CACAC and the wire harness complaint.  The distinctions include the timing of the  liquidation of ACAP, the omission of market concentration and market power allegations, and the inclusion of Denso as a defendant, when it did not plead guilty to price-fixing IPCs.  The Court discusses the distinctions below.

### 1.  Liquidation and Guilty Pleas

ACAP's sole business before it liquidated in 2002, had been assembling dashboards for GM's Cadillac Seville.  It advances its antitrust claim against Yazaki, Nippon Seiki, and Denso for a conspiracy taking place between January 2001 and February 2010.  Defendants assert that the very nature of the conspiracy undermines the plausibility of the antitrust claim.  Simply put, their position is that the allegations in the CACAC create a time line reflecting a three year process from the issuance of RFQs and the actual sales of IPCs. Thus, sales resulting from the conspiracy would not have occurred until 2004, two years after ACAP went out of business.  The time line does not coincide with the conduct admitted by Defendants.

10

Although the RFQ process allegations and the guilty pleas read in isolation present challenges to DPP's claims, the Court assesses the viability of the CACAC upon review of all of the allegations.  See e.g. In re Southeastern Milk Antitrust Litig., 555 F. Supp. 2d 934, 944 (E.D. Tenn. 2008) (examining allegations of conspiracy to set prices and observing that a Sherman Act conspiracy should not be "dismember[ed]" upon review) (citing Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690, 699 (1962)).  Accord In re Packaged Ice Antitrust Litig., 723 F. Supp. 987, 1005-06 (E.D. Mich. 2010) (rejecting the dismemberment approach and observing that the plaintiffs identified the corporate players and executives, the general nature of the agreements, locations and time frames so as to enable the defendants to respond). When the CACAC is viewed in its entirety, it contains sufficient allegations to satisfy DPP's pleading burden.

ACAP's antitrust claim goes beyond the allegations in the CACAC that explain the Request for Quotation process.  (See Doc. No. 48 at ¶¶ 66-69).  ACAP alleged this conduct was part of the course of conduct used to accomplish the conspiracy and increase the price paid on all IPCs sold in the United States.  (Id. at ¶ 65).  Moreover, In Paragraph 75 of the CACAC, DPP alleges that

> Defendants and their co-conspirators knew and intended that their actions regarding their sales of instrument Panel Clusters to motor vehicle manufacturers would have a direct impact on prices for Instrument Panel Clusters sold to all direct purchasers of Instrument Panel Clusters throughout the United States.

(Doc. No. 46 at ¶ 75).

In Paragraph 76, DPP alleges that

> Defendants engaged in a single price fixing conspiracy involving Instrument Panel Clusters that impacted not only multiple bids submitted to OEMs but also the prices paid by all other direct purchasers of Instrument Panel Clusters. Defendants' scheme was implemented, succeeded, and affected the prices for all Instrument Panel Clusters.

(Doc. No. 46 at ¶ 76).

DPP's allegations of timing relative to the conspiracy likewise exceed the time frame specified in the guilty pleas. For example, in the Yazaki Plea Agreement, Count Two of the three-count Information charged Yazaki with "participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of instrument panel clusters sold to certain automobile manufacturers in the United States and elsewhere, from at least as early as December 2002 until at least February 2010." (Doc. No. 61, Ex. B at 2-3). Further, during the relevant period, the sales of IPCs affecting automobile manufacturers totaled approximately $73 million. (Id. at 6). Hence, pursuant to the Plea Agreement, from at least as early as 2002 Yazaki received revenue and payments. The effect on commerce began at least as early as December 2002. (Doc. No. 659 in 12-2311, Tr. at 97-98).

In contrast to the December 2002 date, DPP alleges that it purchased IPCs "directly from one or more of the Defendants during the Class Period," (Doc. No. 48 at ¶¶ 11, 46), which is defined as "at least as early as January 2001" until the present. (Doc. No. 48 at ¶ 90). ACAP alleges that Defendants' conduct occurred earlier than 2002, a belief shared by the Japan's Fair Trade Commission (see Doc. No. 48 at ¶ 38). The time frame alleged in the CACAC is not conscribed by the time frame admitted in

12

Defendants' guilty pleas.

Case law requires the Court to reject an assessment of the CACAC by reading the guilty pleas in isolation. Here, the allegations suggest a broad industry-wide conspiracy that began before the time admitted in the guilty pleas. Defendants' plea agreements cover IPCs as defined by the complaint. Not only did Yazaki and Nippon Seiki plead guilty and pay fines based upon their antitrust conduct relative to IPCs, Denso, a significant player in the IPC market, pleaded guilty to antitrust conduct involving different automotive component parts. The fact that Defendants did not plead guilty to the full range of conduct alleged in the CACAC does not circumscribe this law suit because relatively few defendants plead guilty to all of the charges against them and guilty pleas also factor in such considerations as government resources. The factual allegations in the CACAC create "a reasonable expectation that discovery will reveal evidence of illegal agreement" beyond those parties that have pleaded guilty. Twombly, 550 U.S. at 556. Accord In re Polyurethane Foam Antitrust Litig., 799 F. Supp. 2d 777, 782 (N.D. Ohio 2011) (relying on "specific admissions" made during a governmental investigation that supported the "existence of a conspiratorial agreement").

### 2.  Market Concentration

Next, Defendants contend that the omission of any allegation of the market share of Defendants Yazaki and Nippon Seiki, requires a different outcome in this case than was reached in the wire harness case. In the wire harness case, the defendants were alleged to control 70% of the market demonstrating the market power shared by

the defendants.  Here, the only specific allegation is that Denso controlled 15% of the
global market.  The allegation lacks meaning because Denso did not plead guilty to an
antitrust violation in the IPC market; therefore, no inference that the bid rigging
established a price floor that impacted ACAP's purchases can be made.

The Court disagrees.  ACAP alleges facts relative to price, inelasticity, and
barriers to entry (see Doc. No. 48 at ¶¶ 49-52).  ACAP alleges specifically that a new
entrant into the relevant market would incur significant start-up capital expenditures, for
plants and equipment, as well as transportation, electricity, infrastructure for distribution,
and labor.  (Doc. No. 48 at ¶ 50).  Another factor inhibiting new entrants is the "common
use of contracts between suppliers and large volume purchasers."  (Doc. No. 48 at ¶
51).  Lastly, because there are no viable substitute products, the pricing is highly
inelastic (Doc. No. 48 at ¶ 53).

The structure of the industry makes it susceptible to collusion, and the guilty
pleas demonstrate an express agreement existed to fix prices and allocate customers in
a market with conditions ripe for conspiratorial conduct.  At this stage of the litigation,
these allegations, viewed in the light most favorable to ACAP show an "illicit accord"
not, "lawful unchoreographed free-market behavior." See Twombly, 550 U.S. at 567.

**B.  STANDING/VIABILITY OF CLAIM FOR DAMAGES**

The parties dispute whether ACAP may bring a claim for damages under the
Sherman Act, which requires a direct purchaser plaintiff to demonstrate it has antitrust
standing.  See Static Control Components, Inc. v. Lexmark Int'l, Inc., 697 F.3d 387, 402
(6th Cir. 2012) aff'd on other grounds, 2014 WL 1168967 (S. Ct. March 25, 2014).
"[S]tanding in an antitrust case is more onerous than the conventional Article III inquiry."

14

NicSand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007) (en banc).

In Static Control Components, 697 F.3d at 402, the Sixth Circuit addressed the factors assessed and balanced when deciding whether a claimant has satisfied his burden in pleading antitrust standing. First, the plaintiff must allege "the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused." Id. Second, the court considers "the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market." Id. Third, the court looks at "the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative." Id. Fourth, the court must assess "the potential for duplicative recovery or complex apportionment of damages." Id. Finally, the court must consider "the existence of more direct victims of the alleged antitrust violation." Id. (citations omitted).

The parties dispute whether ACAP's complaint includes factual allegations showing it suffered an injury. Defendants argue that because DPP is not an automobile manufacturer, it was not affected by price-fixing a request for quotation. Instead ACAP speculates that based on a conspiracy among some suppliers to fix prices for sales to certain OEMs, the prices of all IPCs for all purchasers were illegally raised. Here, ACAP alleges that it had to purchase IPC products directly from Defendants at prices established by the OEMs and Defendants in the bidding process, (see Doc. No. 48 at ¶¶ 42-47). ACAP also alleges that Defendants and their co-conspirators "knew and intended that their actions regarding their sales of Instrument Panel Clusters to motor vehicle manufacturers would have a direct impact on prices for Instrument Panel Clusters sold to all direct purchasers of Instrument Panel Clusters throughout the

15

United States." (Doc. No 48 at ¶ 75). Finally, ACAP asserts that the scheme succeeded and affected the prices for all IPCs. (Id. at ¶ 76).

The Court finds these allegations meet ACAP's burden. The CACAC includes allegations that ACAP purchased IPCs directly from one or more of the Defendants and/or co-conspirators during the Class Period, and that Defendants' conspiracy impacted the prices DPP paid for IPCs. Further, DPP alleges that the conspiracy was intended to and did affect the sales prices of IPCs to buyers in the United States. The allegations of price increases paid by a direct purchaser meets ACAP's burden. See In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig., CIV. 12-711, 2013 WL 812143 (D.N.J. Mar. 5, 2013) (finding it unnecessary for the direct purchasers to "state the actual price that they paid" because they alleged the purchases were made directly from the defendants during the conspiracy).

ACAP also includes allegations relative to the second and third factors. It alleges that it was injured in its capacity as a consumer in the relevant market. ACAP alleges direct injuries in that it purchased directly from Defendants and/or their co-conspirators. Because ACAP is a direct purchaser, the law authorizes recovery if it was overcharged. This allegation distinguishes ACAP's situation from one where a plaintiff seeks relief from nonconspirators on an umbrella theory of liability. This theory turns on the claim that a successful price-fixing conspiracy among certain defendants "creates a 'price umbrella' that allows non-conspiring competitor firms to raise their prices without fear of losing market share." In re TFT-LCD (Flat Panel) Antitrust Litig., C 09-4997 SI, 2012 WL 6708866 (N.D. Cal. Dec. 26, 2012) (citing In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation, 691 F.2d 1335, 1339 (9th

16

Cir.1982).  In this case, ACAP purchased directly from Defendants, and there is no

need for complex apportionment of damages. Therefore, the fourth criteria is met.

Finally, ACAP, has satisfied the fifth criteria: as a direct purchaser it is a direct victim of

the alleged conspiracy.  The balancing test is satisfied. The allegations, when viewed in

the light most favorable to DPP satisfy its burden.  In sum, DPP has "causally linked"

their antitrust  injury to "an illegal presence in the market."  <u>Brunswick v. Pueblo Bowl-O-</u>

<u>Mat, Inc.</u>, 429 U.S. 477, 489 (1977).  It alleges it paid a higher price for IPCs purchased

from Defendants than it would have paid absent the alleged conspiracy.  <u>In re Titanium</u>

<u>Dioxide Antitrust Litig.</u>, No. 10-0318, 2012 WL 3711890, at * 10 (D. Md. Aug. 28, 2012)

(citing <u>Hanover Shoe v. United Shoe Mach. Corp.</u>, 392 U.S. 481, 489 (1968)).

### C.  Sufficiency of the Fraudulent Concealment Allegations

ACAP filed its complaint on October 8, 2012, and alleges a conspiracy from at

least as early as January 2001.  Defendants maintain that any claims for damages

suffered from the conspiracy before October 8, 2008, are barred because the statute

requires claims be brought "within four years after the cause of action accrued." 15

U.S.C. § 15b; Klehr v. A.O. Smith Corp., 521 U.S. 179, 189-90 (1997).

In its complaint, ACAP alleged that the statute was tolled until February 2010.

(Doc. No. 48 at ¶ 103).   Whether claims prior to October 2008 are barred turns on

whether the statute was tolled by the fraudulent concealment doctrine.   A plaintiff must

plead three elements to establish fraudulent concealment:

> (1) wrongful concealment of their actions by the defendants;
> (2) failure of the plaintiff to discover the operative facts that
> are the basis of his cause of action within the limitations
> period; and (3) plaintiff's due diligence until discovery of the
>  facts.

Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir. 1975).  A

plaintiff must plead the factual allegations underlying a claim of fraudulent concealment

with particularity.  Friedman v. Estate of Presser, 929 F.2d 1151, 1160 (6th Cir. 1991).

Because DPP's failure to discover the operative facts during the limitations period is not

at issue, the Court limits its discussion to the two disputed elements.

### 1. Wrongful Concealment

To show "wrongful concealment," a plaintiff must show something more than

silence or an unwillingness to reveal wrongful conduct.   Hamilton Cnty. Bd. of Comm'rs

v. Nat'l Football League, 491 F.3d 310, 319 (6th Cir. 2007); Browning v. Levy, 283 F.3d

761, 770 (6th Cir. 2002).  A plaintiff must allege the existence of a "trick or contrivance

intended to exclude suspicion and prevent inquiry."  Pinney Dock & Transp. Co. v. Penn

Cent. Corp., 838 F.2d 1445, 1467 (6th Cir. 1988) (quotation omitted).

Notably, the allegations found to be sufficient for wrongful concealment in Carrier

Corp. v. Outokumpu Oyj, 673 F.3d 430, 446-47 (6th Cir. 2012), were not extensive.  In

that case, the  plaintiffs relied on findings from the European Commission that

conspirators "established security rules to prevent a paper trail. . .and used a coding-

system to hide the identity of the producers in their documents and spreadsheets."  Id.

at 447.  These allegations satisfied the Sixth Circuit, inasmuch as they demonstrated

"active steps to hide evidence, as opposed to simply meeting in secret."  Id. at 447

(citing Bridgeport Music, Inc. v. Diamond Time, Ltd., 371 F.3d 883, 891 (6th Cir. 2004)

(explaining that "hiding evidence" can constitute affirmative concealment)).

Here, ACAP argues that the earliest notice was February 2010, the date that

several Defendants were raided. (Doc. No. 48 at ¶ 104).  There was no information in

18

the public domain about the rigged bids for IPCs; Defendants met and communicated in

secret, and agreed to keep the facts from discovery.  (Doc. No. 48 at ¶¶ 59-65, 78).

Defendants represented to customers and others that the pricing and bidding activities

were unilateral, thereby misleading DPPs as to the true, collusive, and coordinated

nature of Defendants' activities relating to bid rigging, customer allocation, and price-

fixing (Doc. No. 48 at ¶ 107), and Defendants affirmatively concealed their conduct

when the antitrust investigation became public.

The Court found similar allegations sufficient to demonstrate wrongful

concealment in the wire harness case, see In re Auto. Parts Antitrust Litig.,

12-MD-02311, 2013 WL 2456584 (E.D. Mich. June 6, 2013), and Defendants have not

provided grounds for distinguishing the situation here from the decision in the wire

harness case.  The Court finds that ACAP has met its burden to show wrongful

concealment.

## 2.  Due Diligence

In deciding whether ACAP has satisfied its burden as to this element, the Court

again uses the decision in Carrier Corp., 673 F.3d at 448-49  (declining to hold that the

plaintiffs' efforts were insufficient to satisfy the third element "at such an early stage of

litigation and without the benefit of discovery" to guide its analysis) (citing Jones v.

TransOhio Sav. Ass'n, 747 F.2d 1037, 1043 (6th Cir.1984) (noting the panel's

reluctance to dismiss fraudulent concealment allegations prior to discovery).  See also

Duncan v. Leeds, 742 F.2d 989, 993 (6th Cir. 1984) (addressing the need to construe

allegations of fraudulent concealment liberally and in the plaintiff's favor at such an

early stage in the litigation). The Sixth Circuit deemed dismissal appropriate if, and only

19

if, "it is obvious from the complaint that the plaintiff conducted absolutely no investigation."  Id. (citation omitted).   Actions that would deceive a reasonably diligent plaintiff toll the statute.

In Carrier Corp., the Sixth Circuit was satisfied that due diligence had been pleaded because the plaintiff detailed the steps it had taken once it became aware of the EC investigation.  See 673 F.3d at 448.  In the CACAC, DPP alleges that it had no knowledge and could not have discovered the conduct earlier through the exercise of reasonable diligence.  (Doc. No. 48 at ¶ 117).  Here, there is no basis for finding that ACAP failed to conduct any investigation or ignored available information that would have aroused suspicion and prompted an investigation.  In sum, ACAP has included allegations as to each element that must be proven to toll the statute of limitation.

### D.  Sufficiency of the Injunctive Relief Request

DPP asks the Court for an injunction preventing Defendants from "continuing and maintaining" the price-fixing conspiracy.  (Doc. No. 48, Prayer for Relief at ¶ D). The request is authorized under the Clayton Act, which provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.

In challenging the request, Defendants argue that the CACAC lacks the factual support necessary to establish a real or immediate threat that ACAP will be harmed again.  Specifically, Defendants contend that ACAP was not the target of antitrust activity and any real threat of future harm has been eliminated by the guilty pleas.  The Court addressed the same arguments in the wire harness case.  The analysis applies

20

with equal force to the CACAC.

The facts as alleged in the CACAC create an inference of the existence of a "cognizable danger of recurrent violation." See United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953). Specifically, ACAP alleges a decade-long global conspiracy in a market with high barriers to entry. The same market conditions exist today. See In re Static Random Access Memory (SRAM) Antitrust Litig., 264 F.R.D. 603, 611 (N.D. Cal. 2009) (certifying a nationwide class for injunctive relief based upon similar allegations). The fact that some Defendants have pleaded guilty does "not obviate the threat that a conspiracy will persist or resume in the future." In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583, 597 (N.D. Cal. 2010) amended in part, M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011) (certifying a nationwide injunctive class under Rule 23(b)(2)). Despite Defendants' claim that ACAP is no longer in business, on a motion to dismiss, the Court's analysis of the viability of the claim for injunctive relief must be based upon the allegations in the complaint. Here, the Court is satisfied that ACAP has stated a claim for which relief may be granted.

## V. CONCLUSION

For the reasons discussed above, the Court **DENIES** the motion.

**IT IS SO ORDERED**.

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE


DATE: April 30, 2014

21

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the above date a copy of this Opinion and Order was served upon all Counsel of Record via the Court's ECF Filing System.

<u>s/Bernadette M. Thebolt</u>
Case Manager